## Commonwealth v. Boon

*William H. Robinson*, assistant district attorney, for Commonwealth.

*Peacock & Walker*, for defendant.

GIBSON, P. J., May 20, 1946.—Defendant was indicted for wilfully and maliciously maiming or disfiguring a certain domestic animal, to wit, a coon dog of Joseph A. Dronsky. The trial resulted in a verdict of "guilty as indicted".

Defendant has moved for a new trial, charging that the verdict was against the evidence, the weight of the evidence, contrary to law, and contrary to the charge of the court. Additional reasons for a new trial were filed, claiming (1) that certain false information had been communicated to the jury during their deliberations in the jury room; (2) that the court erred in refusing the testimony of John Boon that one sheep was missing after the occurrence; (3) that the court erred in refusing to admit the testimony of John Boon that on the following morning one or more sheep in the flock were sick, injured, and died thereafter; (4) that the court erred in refusing to admit the testimony of James Boon that one or more of the sheep were sick, injured, and thereafter died, and (5) that the court erred in failing to charge the jury regarding the testimony of witnesses as to the good reputation of defendant.

The indictment appears to be drawn under section 941 of The Penal Code of June 24, 1939, P. L. 872, which provides:

"Whoever wilfully and maliciously kills, maims or disfigures any domestic animal of another person . . . is guilty of a misdemeanor, . . .

"This section shall not apply to the killing of any animal taken or found in the act of actually destroying any domestic animal."

There is also applicable the Dog Law of May 11, 1921, P. L. 522, as amended by the Act of May 6, 1927, P. L. 833, 3 PS §461, et seq. Under this act all dogs are declared to be personal property, they are required to be licensed, and to wear a collar and certain evidence of a license. The act further provides that any person may kill a dog which he sees in the act of pursuing, worrying or wounding any livestock, whether or not the dog bears the license tag required, and this without liability for damages or otherwise.

The act also provides that any dog entering any field or enclosure where livestock is confined shall constitute a private nuisance and the owner or tenant of the field, his agent or servant, may kill such dog while it is in the field or enclosure without liability or responsibility of any nature. This authority is limited, in that "licensed dogs, when accompanied by their owner or handler, shall not be included under the provisions of this section, unless caught in the act of worrying, wounding, or killing any livestock". The two acts must be construed together: Commonwealth v. Lefever, 151 Pa. Superior Ct. 351.

The circumstances here showed that Joseph A. Dronsky, on the night of October 31, 1945, was the owner of a coon hound which he had owned for about three years. On this night he, with two companions, took this dog and possibly another, which is not definitely shown, and went hunting on the property of Citizens Water Company No. 2 dam. From the action of this dog, it appeared that he had found a coon trail and, in following it, later went from the Citizens Water Company No. 2 dam across one farm onto a farm owned by defendant, his brother James Boon, and a sister, and continued thereon to, at or near another dam known as the Aluminum Company dam. In doing so, this dog went entirely across the Boon farm, which extended to the Aluminum Company water dam, and in doing so crossed State Highway Route No. 19, which passes near the Boon house.

Defendant and his brother, James Boon, were the only occupants of the dwelling house on this farm. This house was located near Highway Route No. 19, extending from Washington, Pa., to Pittsburgh, Pa., upon which there was considerable travel. One of the brothers, by the light of motor vehicles traveling along this highway, noticed the sheep in a field across the highway from the house moving about and saw a dog there. They armed themselves with shotguns and went

upon the highway. The identity of the dog and what they did there is not definite. Both of them returned to the house nearby and thereafter James Boon went back to the highway. There he met Joseph A. Dronsky and his two companions. At that time a dog was occasionally yelping, apparently on a trail, in the direction of the Aluminum water dam. Some conversation occurred about that farm being posted and trespassers not being permitted, and that there were sheep in the area from which these sounds were coming, at which time Joseph Dronsky expressed his desire to go to the place from which the sounds were coming and get his dog and take it off the place. James Boon denied him this privilege, claimed the land was posted and such action would be a trespass. James Boon then left, going to the house, stating that he would call a constable, apparently to prevent the threatened trespass. James Boon had been on the highway talking to these men for about 15 minutes. John Boon, defendant, knew he was there with them. After James Boon returned to the house and was there with defendant for about 15 minutes, during which time he had gone out on the porch to listen and heard the dog down toward the Aluminum water dam, both brothers, armed with shotguns, loaded with heavy shot, went toward the Aluminum water dam. Near this dam a small tract had been fenced off on three sides, so that it was enclosed on the fourth side by the water of the dam. In this small tract 20 head of sheep had been placed for the night. The two brothers entered this fold. They claimed this dog was annoying the sheep. There is no claim that it caught any of the sheep. Defendant uses the expression when asked what the dog was doing, "It was following up the sheep", was about 20 feet away from them. "I heard it barking". The two brothers remained in this small sheepfold for about half an hour when one of the sheep went through

the wire fence into an adjoining field. Afterwards the dog was heard in that field. They followed, and defendant shot the dog there, substantially cutting off both hind legs about the hock. It went a short distance and either fell or rolled over a bank, and defendant and his brother went up to the house, deposited their guns, then went to Dronsky, who still was on the highway, and told him the dog was shot. Dronsky had heard the shot, and thereafter the howling of the wounded dog. This shooting took place 80 to 90 yards from the road. One hour or more afterward, through the negotiations of a constable, permission was secured to go on defendant's property to where the dog was found still living. Sometime after that defendant, on demand of the constable, shot the dog again, killing it. The next day defendant and his brother claim they could find only 10 of the 20 sheep in the fold and that, within a short time afterwards, one or two of the sheep were taken sick and later died.

There is no dispute that defendant maimed the dog and eventually had to kill the dog of Joseph A. Dronsky to put it out of its misery. Neither is there any dispute that the dog was accompanied by its owner to the farthest extent that he was permitted to go by James Boon, defendant's brother, and that James and John Boon all through were acting in harmony. The question whether or not the maiming was wilful and malicious was for the jury. In determining this question, the jury properly could consider that the owner was available within calling distance to care for and remove his dog; that he desired to do so, and was only restrained by the commands of James Boon, defendant's companion and assistant. The jury also could consider the brutality of the act and the failure to destroy the dog at a time when it was fatally injured and prevent a long period of extreme suffering. They could properly consider whether or not the destruction of the dog

was in good faith on the part of defendant for the purpose of protecting his property, or did it arise from a general ill will as to all dogs, or ill will and hatred toward this dog or its owner. If the jury found defendant's acts were wilful and malicious, his guilt was established unless he was justified by some exception in the Dog Law.

Defendant set up his defense under the Dog Law that the dog was within a field or enclosure where livestock were confined and thereby he had the right to kill this dog without responsibility for his act. It must be noted that this is subject to a limitation and does not apply when the dog is licensed and accompanied by his owner or handler, unless he is caught in the act of worrying, wounding or killing livestock. His defense is an affirmative one and casts on him the burden of proving by a fair preponderance of the evidence that the dog was in the act of pursuing, worrying, or wounding livestock: Commonwealth v. Beatty et al., 91 Pa. Superior Ct. 37.

It is not claimed this dog wounded any sheep. It is claimed that he was pursuing them and that they were worried by the presence of the dog. It must be borne in mind that when the shooting occurred, the dog was in another field than that first referred to and that if he was pursuing or worrying any sheep it was the one which had gone into that field.

Defendant claims, and produces his brother as a witness, that at and immediately before the time of the shooting, and for some time before, this dog was pursuing and worrying the sheep. The testimony is not clear on just what was being done. Pursuit does not necessarily occur simply because one animal is behind another on a common path. It could not be said that because a dog was trailing a game animal on a path on which sheep had preceded, this dog was pusuing the sheep or that it was following them, any

more than it can be said that where two persons walk on a sidewalk, one preceding the other, that the one in front is being pursued by the one in the rear. Notwithstanding defendant and his brother, who testified for him, are not contradicted, the jury is not bound to believe their oral evidence. In the light of all the circumstances, such as their manner of testifying; their interest in the result to be obtained; and their show of prejudice, if any, it is within the province of the jury to determine whether or not the alleged defense actually existed. There are circumstances which indicate exaggeration. The evidence shows this particular dog was in that general location when James Boon and the owner were on the highway talking for about 15 minutes. This could be ascertained by the sound of the dog apparently trailing some game animal. James Boon went to his house, remained there about 15 minutes, while this same situation continued, then went with the defendant, armed with shotguns loaded with buckshot or BB's, and there, for one half hour, stood around in the small sheepfold. After a total period of one hour, they went over into another field and shot this dog. A very proper question is, was the dog pursuing or worrying the sheep? If so, why the long delay? Another appropriate inquiry is, if this dog was pursuing or worrying the sheep, and their motive was protection of their property, why did they not call or permit the owner to take his dog off the premises and remove the menace? This long delay and their refusal to permit the owner to get his dog bear on the weight of their evidence that the sheep were being pursued and worried by the dog and the shooting was necessary and within their rights in protection of their property.

This case is an illustration of the contest between two extremes, namely, the farmer who owns his land absolutely and desires to exercise lordship over it with-

out circumscription, and that group of sportsmen who claim the right, by themselves and their dogs, to carry on their sport without any restrictions by reason of the ownership of the land upon which they desire to go. There are limits on both. The sportsman is a trespasser if he goes on posted lands and is subject to prosecution in a summary conviction. He is required to have his dog licensed, is required to accompany and control it, and at his peril see that it does not pursue, worry, or injure other domestic animals, poultry, etc. The owner of the land has the right to exclusive ownership and possession, and yet he cannot wilfully and maliciously kill a licensed dog which is recognized by law as personal property when accompanied by the owner or handler, except when it is in the act of pursuing, worrying, or killing domestic animals, poultry, etc., and, if he does so, he subjects himself to prosecution. In this case the owner of the dog claimed the right to go on the property regardless of the fact that it was posted. Perhaps his manner was not courteous, and one of the owners apparently seizes upon that as an excuse for denying permission. One of the owners of the property denied the owner of the dog permission to go on the land, even though such permission would have provided safety for the livestock on the farm and ended any annoyance experienced by those animals. The prosecutor observed the injunction not to go on the property. Defendant was not so considerate, but he spent considerable time, and, according to his own story, permitted the continuance of the worrying of his stock in his effort to destroy the dog because he claimed he had a right to do so. He wounded the dog under circumstances which the jury found were not justifiable. He did so in a way which indicated malice, ill will, and a vicious disposition. By the exercise of even a little common sense and restraint, this unfortunate affair would not have occurred.

After a careful review of the entire record, we do not think the verdict was against the evidence, or the weight of the evidence, or contrary to the law, or contrary to the charge of the court.

The additional reason 1 is based entirely on the statement of counsel unsupported by any proof, and, in the present state of the record, is no ground for granting a new trial.

The additional reasons 2, 3 and 4 are closely related and should be considered in the order this question occurs in the testimony. John Boon, the witness, testified that one sheep was missing from the sheepfold and one was in the adjoining field, and the one in the adjoining field appeared all right. It was proposed on behalf of defendant to show by his testimony that he knew all of the sheep were all right the evening before, that there was no disturbance during the night, and later on this sheep was sick and died. An objection was made to this testimony which was sustained. A discussion took place regarding this ruling. It was there explained by the court that merely on the showing that a sheep got sick and died, the conclusion could not be drawn that it was killed by the dog. There is no evidence connecting the presence of the dog in or about the sheepfold and the death of this sheep, or that the presence of the dog was the cause and the death was the effect, and there was no offer to prove such facts. Again, it is claimed on behalf of defendant that the next morning one of the sheep was missing. It appears to be suggested, by reason of the steepness of the bank adjoining the Aluminum Company water dam, the sheep fell into the water and was lost. There is no evidence whatever of such result. There is no proof that the presence of the dog in the fold or near it accounted for, or could account for this missing sheep, if one was missing. There is no evidence that the dog caught hold of any sheep or attempted to. So far as the evi-

dence shows, the sheep may have been stolen. It may have escaped into another field or farm. It is mere conjecture to offer the absence of this sheep, or the fact that one or two sheep died several days afterward, as evidence that this dog pursued or worried any of them. As the case stood at the time these rulings were made, they were correct. It was required that some proof should be made showing the connection between the presence of the dog and the results claimed, but no attempt was made to do so.

A number of persons were called who testified that John Boon bore a good reputation as a peaceable and law abiding citizen. This was just about the last testimony produced in the trial and this testimony was argued on behalf of the defense. The court's charge makes no special reference to it. The whole of the charge related to *all of the evidence*. No request was made for any special instructions regarding the evidence of reputation. At the end of the charge, counsel for the Commonwealth and defendant were asked, in the presence of the jury, if counsel had anything in mind which the court had overlooked. Both counsel answered in the negative. Immediately following, answers were made to two points and the jury retired. We can find no authority requiring the court to specifically charge regarding this particular type of evidence. If counsel desired special instructions, a point should have been submitted, or at least, if counsel deemed this evidence so important, the court's attention should have been called to the absence of specific instructions before the jury retired. We have not found any authority which holds that failure of the court to give special attention to evidence regarding reputation is error.

And now, May 20, 1946, defendant's motion for a new trial is overruled and he shall present himself for sentence when called by the district attorney.